# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| SYLVIA A. FONTENOT | * | CIVIL ACTION NO. 05-0699 |
| VERSUS | * | MAGISTRATE JUDGE HILL |
| COMMISSIONER OF SOCIAL SECURITY | * | BY CONSENT OF THE PARTIES |

## REASONS FOR JUDGMENT

The undersigned was referred this social security appeal by consent of the parties. For the reasons set forth below, the Commissioner's decision is **REVERSED AND REMANDED** for further proceedings.

## I.      Background

The claimant, Sylvia A. Fontenot ("Fontenot"), age 53, filed a claim for disability insurance benefits on September 16, 2003, claiming disability since January 31, 2003, due to back problems.[1]  She has a high school education and past work experience as a nursing home housekeeper, kitchen helper, and school cook.

Dr. Stephen Nason, an orthopedic surgeon, has treated Fontenot for low back and posterior hip pain since February 1, 2002.  At that time, she was working as a high school cafeteria worker.  On examination, she had some tenderness in the

---

[1]Fontenot was insured for disability benefits through September 30, 2003.  (Tr. 13). Thus, she must establish disability on or prior to this date.

posterior iliac crest area and pain which radiated across the iliac crest into the groin area. Pelvic x-rays revealed some mild narrowing and increased sclerosis at the lower portion of the right SI joint. Dr. Nason's impression was chronic sacrioiliitis, for which he prescribed Medrol.

On January 31, 2003, Fontenot was continuing to have significant back problems. The Medrol was helping some, but not a great deal. Fontenot advised Dr. Nason that she had resigned from her job because of problems at work.

On February 28, 2003, Fontenot reported left shoulder pain and some swelling in the arm, which radiated almost to the wrist at times. She was taking Bextra, which helped some. Dr. Nason added Flexeril to help with nighttime pain.

In May, 2003, Fontenot continued to have intermittent hip pain, particularly with standing too long or doing too much on her feet. She also noted some grinding in her left knee, which had some marked crepitation on examination. Additionally, she had some left arm pain, which Dr. Nason injected at the trigger point.

On July 9, 2003, Fontenot wanted to go back to work, but was not sure whether she would be able to tolerate it. Dr. Nason thought that it was okay for her to try, but he stated that "I frankly would be very surprised if she is going to be able to tolerate

it through. I think with her problems she is going to be very limited in what she is able to do." (Tr. 124).

On August 8, 2003, Fontenot reported that she had tried to go back to work, but had lasted only one hour on the second day because of lifting. Dr. Nason stated that "it is evident that she is not going to be able to tolerate return to work at all," which he advised her not to do. (Tr. 123). He gave her an injection in the right SI joint.

In November, 2003, claimant required a second SI joint injection. Dr. Nason continued to treat her with oral anti-inflammatory medicines and muscle relaxers for intermittent neck and arm pain. He noted in January, 2004, that she was experiencing a bit of agitation and depression from her continued symptoms.

On March 11, 2004, Dr. Nason injected Fontenot in a trigger point over the scapula. She continued to complain of sacroiliac pain, as well as intermittent left knee problems.

Claimant was doing "pretty much the same overall" on December 17, 2004. She was hurting on and off during the day, with more problems at night. She reported that the muscle relaxers, Flexeril, helped more than anything. She was still taking pain medication and Bextra. Dr. Nason noted that the last injection did not seem to help for more than two to three weeks. He stated that he would continue with her symptomatic treatment.

On December 18, 2002, Fontenot saw another orthopedic surgeon, Dr. Elemer Raffai, for right hip and low back pain. On cervical spine examination, she had no muscle spasms, point tenderness or guarding. She had no signs of upper extremity weakness, atrophy, or loss of sensation. Reflexes were normal. In the lumbar spine, she had tenderness at L5-S1, stiffness, and muscle spasms. Dr. Raffai's impression was right hip bursitis and low back pain. He administered a trigger point injection, prescribed Vioxx and Keto Cam Gel, and recommended an MRI.

At the followup examination on January 3, 2003, Fontenot still complained of pain in the lower back. Physical examination revealed point tenderness at L5-S1 with stiffness. The MRI showed disc bulging at L5-S1 and spinal stenosis, which was causing some pressure on the S1 nerve roots and thecal sac. Dr. Raffai's diagnosis was lumbar enthesopathy. He recommended a steroid epidural injection.

In the Residual Functional Capacity Assessment dated October 20, 2003, the examiner determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently; stand, walk and sit about 6 hours in an 8-hour workday, and had unlimited push/pull ability. She was able to perform all postural activities occasionally, except that she could never climb ladders, ropes, or scaffolds. The examiner noted that Fontenot should be able to do light work.

At the hearing on January 21, 2005, Fontenot was 52 years old. She testified that she was 5 feet tall and weighed about 140 pounds, and that her weight had gone up about 15 pounds since she had stopped working. She stated that she had a GED.

Regarding employment, Fontenot reported that she had worked as a housekeeper in a nursing home for 10 years. She had also worked at a high school as a cook. She stated that had stopped working because of back and hip pain. Additionally, she complained of left shoulder pain and swelling.

Fontenot testified that Dr. Nason had given her injections in the low back and by her neck, which had helped for awhile. He had also recommended stretching exercises, which gave her temporarily relief. Additionally, she used a heating pad and ice for her back, and took Bextra, Flexeril, and Tylenol daily, which helped some. Her husband, Warren, testified that the medications made her "groggy" and "sluggish." (Tr. 156).

As to restrictions, Fontenot reported that she had problems with raising her left arm above shoulder level. She also had back pain after standing and walking for awhile. Additionally, she complained that she dropped things sometimes.

Regarding activities, Fontenot testified that she had good days and bad days. On good days, she washed, drove, washed dishes, did laundry, cooked, did a little yard work, grocery shopped, and walked around Wal-Mart with her husband.

Additionally, she visited with her two children often, and with two friends occasionally. She reported that she had to lie down and rest for about one to two hours almost every day.

Dr. George E. Hearn testified as a vocational expert at the hearing. He classified Fontenot's past work as a school cafeteria cook as light to medium and semiskilled, and a housekeeper as light and unskilled. The ALJ posed a hypothetical in which he asked Dr. Hearn to assume a claimant of the same age, education, and work experience; who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk about six hours in an eight-hour day and sit for six hours, and could do no overhead work with the left arm. In response, Dr. Hearn testified that she could do food service work, of which there were 500,000 light jobs available nationally and 8,000 statewide, and home housekeeper, of which there were 3,000,000 positions nationally and 37,000 statewide. When the ALJ asked whether claimant could do any of these jobs if she had to lie down during a workday for one to two hours at a time, Dr. Hearn responded that she could not.

Finally, the ALJ asked whether there were any jobs claimant could perform if she took medications which caused drowsiness or the need to lie down, had almost daily shoulder pain with swelling, was unable to walk or stand for any extended period because of back pain, and was required to stop and lie down every so often

during the day because of these problems. In response, Dr. Hearn replied that there were not.

**Law and Opinion**

On appeal, Fontenot argues that the ALJ erred in determining credibility, and that the ALJ's decision was not supported by substantial evidence. Because I find that the ALJ erred in assessing Fontenot's residual functional capacity, I order that the Commissioner's decision is **REVERSED and REMANDED** for further proceedings.[2]

Fontenot asserts that her treating physician's final opinion regarding her ability to work should be controlling in this case. (rec. doc. 7, p. 7). After Fontenot's unsuccessful attempt to return to her job as a cafeteria worker, Dr. Nason stated that "I think it is evident that she is not going to be able to tolerate return to work at all." (Tr. 123). However, Dr. Nason did not indicate whether he was restricting his opinion to her job as a cafeteria worker, or rather, extending it to all work. The ALJ

_____

[2]The Court notes that Fontenot submitted new evidence from Dr. Nason and University Medical Center dated August 8, 2005 to September 28, 2005, and Dr. A. John Tassin, Jr. dated October 26, 2005. (rec. docs. 12-2, 14, 16). In order to justify a remand, the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding. *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995). The new evidence must pertain to the contested time period and not merely concern a subsequently acquired disability or the deterioration of a condition that was not previously disabling. *Leggett*, 67 F.3d at 567. As the evidence sought to be submitted by claimant does not pertain to the contested time period, it is not material to this proceeding. The appropriate action regarding these facts is to use the evidence as the basis for a new disability application, if timely.

limited Dr. Nason's opinion to claimant's "previous work" only. (Tr. 15).

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." *Newton*, 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)).

While the ALJ assumed that Dr. Nason precluded Fontenot only from returning to her "previous work," such limitation is not clear from the record. (Tr. 15). Instead, Dr. Nason's report indicates that "she is not going to be able to tolerate return to work at all," without specifically saying whether that statement refers to her work position at that time, or to all work. (Tr. 123).

The Fifth Circuit has held that if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling

weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e). *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). In this case, Dr. Nason's reports are not clear as to whether he precluded Fontenot from all work, or just from working in her previous position. The ALJ assumed, without seeking further clarification, that Dr. Nason's opinion was limited to Fontenot's job as a cafeteria worker. Because Dr. Nason's opinion is unclear, the Court finds that this case should be remanded for a determination by Dr. Nason or another orthopedic specialist as to Fontenot's residual functional capacity on or before September 30, 2003, which was the date through which she was insured for disability benefits. (Tr. 13).

Additionally, the Court notes during the relevant time period, claimant was taking Flexeril, Elavil, Bextra, Vioxx, Mobic, and Medrol. (Tr. 98, 115-16, 121-30). Fontenot's husband indicated that these medications made her "groggy" and "sluggish." (Tr. 156). While the ALJ noted that Fontenot was taking extra-strength Tylenol at the time of the hearing, he failed to consider the other medications that were prescribed during the relevant time period. (Tr. 16). Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or

other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). The medication which claimant was taking is absolutely consistent with her continued complaints and the objective medical evidence. The ALJ did not take the claimant's prescription medication into consideration, and his failure to do so was error.

Claimant argues that she is unable to work on a sustained basis because of pain. A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that she can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). The vocational expert testified that there would be no jobs available to a claimant who was taking medications that occasionally caused drowsiness or the need to lie down, had shoulder pain with swelling on almost a daily basis, was unable to walk for any kind of long distance or stand for an extended period because of back pain, and had to stop and lie down during the day because of these combined factors (Tr. 160). However, none of claimant's treating physicians have indicated exactly what her work-related limitations are. Thus, I find that this matter should be remanded for further proceedings.

Accordingly, it is ordered that the Commissioner's decision is **REVERSED**

**AND REMANDED**.

Signed this 13th day of February, 2006, at Lafayette, Louisiana.

_C. Michael Hill_

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE